UNITED STATES of America, Plaintiff,

v.

AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS, et al., Defendants.

Civ. A. No. 13–95 (WCC).

United States District Court,
S.D. New York.

July 1, 1994.

White & Case (I. Fred Koenigsberg, of counsel), and Paul, Weiss, Rifkind, Wharton & Garrison (Allan Blumstein, of counsel), and American Soc. of Composers, Authors and Publishers (Ross Charap, of counsel), New York City, for American Soc. of Composers, Authors and Publishers.

U.S. Dept. of Justice, Antitrust Div., Washington, DC (Maureen Casey, of counsel), for plaintiff.

Kay Collyer & Boose (Daniel P. Levitt, R. Andrew Boose, Toby M.J. Butterfield, of counsel), New York City, for objectors Elizabeth I. Peters, et al.

Charles M. Newman, and Neal R. Platt, New York City, for objector Steve Karmen.

Elsmere Music, Inc. for Elsmere Music, Inc., et al., Objectors, Pro Se.

Gear Pub. Co., pro se by Edward F. Andrews, Jr.

Michael Karp Music, Inc. by Michael Karp.

Peter Scott Fish, pro se.

Dan Foliart, pro se.

The Professional Composers of America, pro se by Doug Wood.

Gramavision Music Co., by Jonathan F.P. Rose.

Josef Weinberger Ltd., pro se by Richard M. Toeman.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

This action is within this Court's continuing jurisdiction over a consent judgment (the "Consent Decree") entered herein some 44 years ago between the Government and the American Society of Composers, Authors and Publishers ("ASCAP"). Originally entered on March 13, 1950, the Consent Decree reflects the parties' efforts to settle the antitrust problems arising from the business practices of ASCAP, a music licensing society with over 60,000 members and a repertory consisting of over 3 million musical compositions. The terms of the Consent Decree, as amended in 1960, continue today to govern the manner in which ASCAP both licenses the use of the works in its repertory and distributes the royalties collected thereby to its member composers, lyricists, and publishers. Pursuant to § XVII of the Consent Decree, this Court has continuing jurisdiction to oversee the ongoing implementation of the provisions therein.

The action is currently before the Court on ASCAP's motion to amend a number of Consent Decree provisions relating to the distribution of royalties to ASCAP members.

## BACKGROUND

The percentage of profits a member receives from ASCAP pursuant to ASCAP's collection of royalties for the public performance of the member's work depends upon the classification of the performance of his work. ASCAP's system of classification of compositions and distribution of royalties is explained in detail in several Attachments to the 1960 Consent Decree. Attachment A (the "Writers' Plan of Distribution") and Attachment C (the "Weighting Rules") are part of the Consent Decree. Changes to these provisions must be made by application to this Court to amend the Decree. Members of ASCAP and the Government are given notice of the proposed changes and an opportunity to be heard as to why they believe the changes are not consistent with the antitrust policies underlying the Consent Decree. Here, the Government does not object to the proposed changes, but a number of members do.[1]

A separate "Weighting Formula" printed with the 1960 Decree specifies the precise weight given to each type of performance for royalty distribution purposes. The "Writers' Distribution Formula" is similar. Changes in these provisions do not require Court approval. Rather, such changes are permitted provided ASCAP give the Government 30 days written notice. Any objection by the Government is to be heard in this Court. Again, the Government does not object to the proposed changes.

As explained in the affidavit of ASCAP's President Marilyn Bergman, dated April 18, 1994 (the "Bergman I Aff."), the proposed changes are the result of a six-month review of ASCAP's operations by the management consulting firm of Booz–Allen and Hamilton. The findings of this review indicated that ASCAP needed to update its distribution system so as to (1) more effectively compete

---

1. Notice of the proposed changes was sent to all ASCAP members by April 29, 1994, pursuant to an Order to Show Cause so ordered by Judge Edelstein on April 19, 1994. The Order to Show Cause and the Notice provided that any member could appear at the hearing before this Court scheduled for May 31, 1994, provided that member served notice of his intention to be heard upon ASCAP by May 24, 1994. ASCAP received 6 such notices by May 24. On the same day, several other members and the estates of members moved this Court to adjourn the hearing date and to compel ASCAP to produce certain documents (the "Elizabeth I. Peters, et al. objectors"). After a hearing on this application on May 27, 1994, we adjourned the hearing to June 20, 1994, ordered ASCAP to produce certain documents to the movants, and set June 13, 1994 as the date by which the movants had to serve notice of intention to be heard upon ASCAP. The movants did indeed serve objections to the proposed changes on that date. Thereafter, a hearing was held on June 20, at which time ASCAP, the Government, and members objecting to the proposed changes were given the opportunity to be heard.

with Broadcast Music, Inc. ("BMI"), AS-CAP's principal music licensing society competitor; (2) update and simplify distribution rules that had not significantly been changed for 35 years; and (3) ensure that payments to members more accurately reflect the value of different types of performances in the marketplace today. Pursuant to these findings by Booz–Allen and Hamilton, ASCAP's Board of Directors approved the host of changes now proposed by ASCAP· to be approved in the instant proceeding. Bergman I Aff. at 2–3. Those that require this Court's approval are the subject of this proceeding, while those that do not require our approval have been or soon will be implemented by ASCAP.[2] Appendix A attached hereto contains the Writers' Plan of Distribution and the Weighting Rules with the proposed amendments.

## DISCUSSION

■ There is no question that this Court possesses the power to modify the instant Consent Decree: "[a] continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need." *U.S. v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999

(1932). As explained recently by the Second Circuit, a flexible standard should be applied in determining whether to modify a consent decree due to changed circumstances when the "decree seeks pervasive change in long-established practices affecting a large number of people, and the changes are sought to vindicate significant rights of a public nature." *Patterson v. Newspaper & Mail Deliverers' Union,* 13 F.3d 33, 38 (2d Cir.1993) (affirming this Court's opinion and order, dated July 30, 1992, dissolving a consent decree on the ground that its objectives had been achieved.)

Before discussing each of the proposed changes specifically, we address two objections various members have posited that go to the changes as a whole. We note again that the Government has not objected because it sees no anticompetitive impact and believes ASCAP has both followed the appropriate procedures and offered a reasoned explanation for the proposed changes.[3]

■ First, a number of members claim that the changes should not be approved by this Court because they were not formulated based upon objective surveys of performances as required by ¶ XI [4] of the Consent Decree.[5] In other words, they argue that

2. The Elizabeth I. Peters objectors attempt to have us prohibit ASCAP from implementing a change in the Writers' Distribution Formula that would replace the existing Radio Feature Award ("RFA") with a new Radio Feature Premium ("RFP"). Briefly, the purpose of both of these provisions is to make larger payments for the use of hit songs on radio so as to better compete with the large payments BMI offers for works achieving high levels of feature performances on radio. As discussed *supra,* we may rule on the appropriateness of such a change to the Writers' Distribution Formula only if the Government has objected to it. Here, the Government has consented to the change, and thus, we do not have jurisdiction to review it. *See U.S. v. ASCAP/Karmen,* 832 F.Supp. 82, 86 (S.D.N.Y.1993) (J. Conner).

3. We note here that ASCAP contends that the basis for most, if not all, of the objections is that the objectors fear they will earn less in royalties as a result of the changes. ASCAP points out that by virtue of the nature of the finite royalty "pie," any change in the distribution system will hurt some members and benefit others. They argue that the issue is not whether some members are angry about decreased royalty distributions, but rather whether the changes benefit the

ASCAP membership as a whole and are the result of sound business decisions.

4. ¶ XI provides that ASCAP must "distribute to its members the monies received by licensing rights of public performance on a basis which gives primary consideration to the performance of the compositions of the members as indicated by objective surveys of performances ... periodically made by or for ASCAP."

5. The Elizabeth I. Peters, et al. group of members, Steve Karmen, and the Elsmere Music, Inc., et al. group of members have objected on this ground.

Furthermore, the Professional Composers of America, Gramavision Music Co., and Josef Weinberger Limited also complain about AS-CAP's survey system. They argue that the current survey system is insufficient to produce the required information base necessary to distribute royalties on "a basis which gives primary consideration to the performances of the compositions of the members." This is because the present survey system generates a considerable amount of unidentified music such that ASCAP members who compose certain types of music are not compensated even though their works are public-

ASCAP has not complied with the mandates of the Consent Decree because they did not perform such objective surveys before concluding that a change in the distribution system was warranted.

We disagree. While the Consent Decree does require ASCAP to conduct objective surveys of music use and use such as the basis upon which royalties are distributed, there is no indication that ASCAP has not done so. ASCAP conducts many surveys each year so as to monitor music use and keep track of which compositions are publicly performed throughout the country via different media. These surveys do guide royalty distribution; they are used to calculate the total number of public performances of each work in the repertory, which in turn forms the basis for distributions.

The objecting members seem to complain, however, that no objective surveys have been performed upon which ASCAP has based its conclusions as to the relative *weights* to be accorded different types of music use. That is, ASCAP is faulted for not conducting a scientific study and proving from the results therefrom that feature performances should get X% credit, jingles Y% credit, etc.

The Consent Decree does not call for such a survey, and we question whether one is even possible. Objective surveys do not offer guidance as to the *value* of each type of performance to the repertory because such valuations are necessarily subjective. What ¶ XI requires is that ASCAP, after determining the proper weights to accord different types of performances, distribute royalties on the basis of objective surveys. ASCAP has satisfied this duty by engaging Booz–Allen and Hamilton to examine its operations and determine what uses were and were not being accorded the proper weight so as to reflect their relative performance values, and by continually conducting scientifically reliable music use surveys so as to distribute royalties to those members in the weighted ratios in which their is publicly performed. Therefore, we reject this argument as a basis upon which to disapprove the proposed Consent Decree amendments.

■ Second, the Elizabeth I. Peters objectors argue that we should not approve the proposed changes because they are the result of uninformed decision-making by ASCAP's Board of Directors. Specifically, they argue that the Board, in approving the changes after analyzing their effect on members' distributions, specifically relied on projections of local television revenue predicting a 25% increase in revenue for 1994. They argue that this increase reflects a one-time settlement between the local television industry and AS-CAP, such that the revenue increase for the years following 1994 will not be nearly as dramatic. The objectors contend that the Board was not fully made aware of this significant fact, so that their decision was based on erroneous assumptions.

While it is true that the Board was given the 1994 revenue projections, we believe AS-CAP's counsel's representations that the Board was fully aware that the 25% revenue increase was a non-recurring item when it approved the proposed changes. ASCAP has been engaged in intense litigation with the local television industry for over 10 years (the *"Buffalo Broadcasting* proceeding") concerning licensing fees for the period 1983 through 1995. It defies reason to suggest that the Board was unaware of the one-time revenue increase for 1994 due to a settlement of this litigation. Moreover, documents provided to the Board containing revenue projections for 1994 and 1995 showed a dramati-

---

ly performed. ASCAP has admitted that works often go unsurveyed or unidentified. While we are sympathetic with the members' argument and apparent difficulty in obtaining compensation for the public performance of their works, these objections do not go to any of the specific proposed changes which are the subject of our instant review. ASCAP has represented that it is attempting to remedy the problem; we urge AS-CAP to continue to do so.

In addition, Karmen and Elsmere, et al. argue that ASCAP's entire weighting and distribution system should be abandoned in favor of a durational distribution system whereby members would be compensated on the basis of the actual number of minutes each member's music is publicly performed, regardless of the type of music. But whether ASCAP's royalty distribution system should be scrapped entirely is not at issue here. These members' objections are not relevant to the instant proceeding, which as explained, concerns only whether the specific proposed changes should be approved.

cally more modest increase in revenue for 1995 than for 1994. We cannot assume the Board ignored these figures. *See generally* Bergman II Aff., dated June 17, 1994.

Therefore, we reject the objectors' argument—that ASCAP's Board of Directors approved the changes on the basis of either a lack of information or misinformation—as a basis for not approving the proposed amendments to the Consent Decree.

We turn now to ASCAP's specific proposed changes.

### A. Changes to Attachment A—the Writers' Plan of Distribution

■ ASCAP asks us to approve several changes in the Four Fund Plan contained in the Writers' Plan of Distribution.[6] In sum, ASCAP argues that because Four Fund Writers will not benefit from the new RFP [7] as much as Current Performance Writers will, they should not contribute to the RFP as much. The specific amendments needed to implement the changes to the distribution system necessary to achieve this goal are detailed in Appendix A, Attachment A.

The Government does not object to these changes, and apart from the general objections discussed above, only one ASCAP member, Gear Publishing Company, objects. Gear, who owns the publishing rights to the music of Bob Seger, essentially complains about *past* mistreatment of it and Bob Seger under the Four Fund Plan. They posit no argument concerning the specific changes before us, and they do not contend that these changes contravene the antitrust policies underlying the Consent Decree.[8] While Gear

may have a valid grievance with ASCAP, this proceeding is not the appropriate vehicle for its redress.

Therefore, because the Government has not objected, because the changes do not appear to be inconsistent with the antitrust policies underlying the Consent Decree, and because the changes are the product of sound business judgment by ASCAP's Board of Directors, they are approved.

### B. Changes to Attachment C—The Weighting Rules

#### 1. Weight Accorded Background, Cue, and Bridge Music in ¶¶ (B)(3) and (B)(4)

■ ASCAP proposes to eliminate entirely from ¶ (B) of the Weighting Rules the specific performance weight given background, cue, or bridge music on a durational basis, and instead place that percentage in the Weighting Formula. The effect of such a change would be to put this number beyond the reach of judicial supervision because the provisions of the Weighting Formula, and changes thereto, are not within this Court's jurisdiction absent objection by the Government.[9]

ASCAP argues such a change is warranted because all the performance percentage weights, except the one at issue, are already in the Weighting Formula, not the Weighting Rules, and in the name of uniformity, this weight should be moved to the Weighting Formula.

Several objectors argue that the only purpose of the proposed change is further to eliminate judicial oversight of the Consent

---

6. "The Four Fund system of writer distribution is an income averaging mechanism. It restricts volatility in payments to those writer members who choose it by basing their distributions on factors including one, five and ten year averages of performances and seniority." Bergman I Aff. at 7 n.l.

7. *See supra* note 2.

8. On the contrary, the proposed changes to the Four Fund Plan arguably serve the underlying antitrust policies of the Consent Decree. The RFP is designed to enable ASCAP to make distributions to its hit songwriters more competitively with those of BMI. The Four Fund Plan

changes, necessary to fairly implement the RFP, therefore further the goal of competition.

9. In its original proposed changes, ASCAP suggested that the 36% figure be eliminated from ¶ (B)(4), and that 42% be substituted for it in ¶ (B)(3) only as an example, thereby enabling ASCAP to effect future changes without this Court's approval. After the hearing, however, at which we expressed our concern about taking actual numbers out of the Rules and putting them into the Formula instead, ASCAP submitted revised proposed changes wherein it kept the 42% figure as the specified percentage, not merely as an example. *See infra* p. 70. Appendix A contains the revised proposed changes.

Decree and thereby vest even more unfettered discretion over royalty distribution in ASCAP.

While we are not as skeptical as are the objectors of ASCAP's intention and ability to set weighting percentages fairly, we agree with them that ASCAP has offered no significant reason to support the proposed change. The purpose of the Consent Decree was to afford the Government and this Court some control over ASCAP's operations so as to avoid future antitrust problems. This Court will not approve taking something out of the Weighting Rules, the effect of which is to eliminate our review of future changes, absent a compelling reason. ASCAP cannot and has not argued that such a change furthers the antitrust purposes underlying the Consent Decree, nor has it offered any justification for the change apart from uniformity. Therefore, despite the fact that the Government does not object, we decline to approve this proposed change.

ASCAP argues in the alternative that at the very least, we should approve changing the percentage at issue from 36% to 42%, while leaving the provision itself in the Weighting Rules. The purpose of this change is to credit works more consistently with their relative performance values. Because the Government does not object, because such a change is not inconsistent with the antitrust policies underlying the Consent Decree, and because the change is a result of sound business judgment by ASCAP's Board, it, along with the other related changes in ¶¶ (B)(3) and (4) as detailed in Appendix A, are approved.

*2. Credit Given Musical Works Accompanying Advertising, Promotional, and Public Service Announcements*

■ ASCAP proposes a change in the last sentence of ¶ (A)(1). At present, this rule provides that a musical work, other than a jingle, used in connection with an advertising, promotional, or public service announcement shall receive the same credit as does a theme. ASCAP proposes to eliminate this provision entirely from the rule because for several years, as a result of changes in the Weighting Formula, ASCAP has not credited such works in the same manner as themes.

The Elizabeth I. Peters objectors argue that in so doing, ASCAP has been violating the Consent Decree for many years. They argue because of such violation, this Court should not approve the proposed change which seeks, after the fact, to confirm ASCAP's authority to differentiate between themes, commercials, and promotional announcements.

Whether or not ASCAP has violated the Weighting Rules in the past is not at issue in this proceeding. Rather, the relevant question is whether or not the proposed change is supported by significant justification and not inconsistent with the antitrust purposes underlying the Consent Decree. It seems reasonable to this Court for ASCAP to assign different weights to program themes as opposed to music, other than jingles, used in commercials and promotional and public service announcements. ASCAP's Board has exercised sound business judgment in concluding that themes deserve, in some instances, greater credit due to their greater performance value.

Therefore, because the Government has not objected and because the proposed change is not inconsistent with the underlying antitrust policies of the Consent Decree, we agree with ASCAP that a change in Weighting Rule (A)(1), along with changes to Rule (A)(7)(2) and the first paragraph and subsection (2) of Rule (B) needed to implement this change, are appropriate.

However, a minor modification to ASCAP's proposal is warranted. Specifically, as with the percentage weight for background music discussed *supra*, ASCAP has offered no significant reason to eliminate completely judicial oversight of this provision. If we were to approve ASCAP's proposal as is, the weights accorded music used in conjunction with advertising, promotional and public service announcements would be entirely within the province of the Weighting Formula, over which we have no power of review absent Government objection. Therefore, we think it proper to keep the actual percentages in the Weighting Rules. We can do this by, instead of deleting it, having the last sentence of Rule (A)(1) read as follows:

A musical work (other than a jingle) used in conjunction with an advertising, promotional, or public service announcement shall receive the credit proposed by the Society as explained in its application for Amendment to the Consent Decree and Notice to members in April 1994.[10]

This language operates to approve the percentage weights ASCAP now proposes these works receive, while requiring ASCAP to apply to this Court for future changes thereto.

We note, however, that in approving, with modification, ASCAP's proposed change to this aspect of Weighting Rule (A)(1), we neither condone, condemn, nor otherwise recognize ASCAP's alleged violation of the Consent Decree. The Government has represented that it is currently investigating whether such a violation has occurred.

### 3. Theme Definition

■ ASCAP proposes an additional change to Rule (A)(1) of the Weighting Rules. Specifically, ASCAP argues that celebrity signature songs and music used to introduce program segments should be given credit as background music rather than as themes.[11] It contends that because of the relative infrequency of such music use, it is unduly time-consuming and inefficient to monitor this music for theme categorization, which requires alteration of the present cue sheet identification system and double-checking the cue sheets submitted by program producers.

Several members [12] object to the proposed changes. The crux of their argument is (1) it is unfair and discriminatory to eliminate theme credit for these works when they are, in essence, themes; (2) contrary to ASCAP's assertions, the number of such works is and will continue to increase; and (3) the burdens on ASCAP in identifying the works are not as great as ASCAP has represented and can easily be mitigated.

We agree with the objecting members. Music that introduces and identifies program segments may be just as valuable as music that introduces the program itself. Such music cannot logically be categorized as background music because it simply is not background music. It is theme music in that it serves to identify a program or a segment thereof. Moreover, if it were accorded background music credit, it would be compensated on the basis of the duration of its performance. As the members point out, the performance value of these program segment themes is not necessarily proportional to the duration of their play. A short segment theme may get much more attention and be much more valuable than a long background music performance. Furthermore, one of the purposes of the 1960 Order was to ensure that ASCAP members were treated fairly and equitably vis-a-vis both ASCAP and one another. Awarding only background credit for music that introduces program segments, and is therefore in reality theme music, would not further the goals of the 1960 Order. While we are mindful of the possible expense burden ASCAP may face in having to administer this distribution, we are confident that a system less onerous than that of which ASCAP complains can be developed. In fact, the objecting members have offered several solutions that may be explored by ASCAP.

Therefore, the proposed change to the theme definition in the first sentence of Weighting Rule (A)(1) is not approved.

### 4. Jingle Definition and Credit for Short Feature Performances

■ ASCAP proposes a change in the jingle definition in Rule (A)(3) of the Weighting

---

10. To be consistent, the related changes to the first sentence of ¶ (B) and to ¶ (B)(2) must also have additional language. The additional language in both sections should read "... or (for compositions other than a jingle) in conjunction with advertising, promotional and public service announcements in accordance with Paragraph (A)(1) above, ..." *See* Appendix B.

11. A celebrity signature song is a song that identifies a particular radio and television personality, e.g., Bob Hope and "Thanks For the Memories." Music used to introduce a program segment can be characterized as a theme song used to introduce a particular segment of the program rather than the program as a whole, e.g., the music used to introduce Saturday Night Live's Weekend Update segment.

12. These members are Michael Karp, Peter Fish, and Dan Foliart.

Rules as it relates to works not originally written for use in advertising, promotional, or public service announcements. Such works are currently credited as jingles if they do not have five feature performances in ASCAP's surveys over the five preceding years. ASCAP argues that this test is obsolete because they are in the process of expanding the size of the radio and television surveys, so that more feature performances are surveyed. ASCAP proposed that such music should be credited as a jingle if it has earned fewer than 150 feature performance credits in the radio and television surveys in the five preceding years. *See* Appendix A.

ASCAP also proposes a change in Weighting Rule (B)(1) as it relates to the reduction of credit for television feature performances of less than 45 seconds in duration. ASCAP argues again that because of the expanded surveys, the current test is obsolete. In its place, ASCAP argues that the standard for qualification is a sensible substitute, and that only short television performances of non-qualifying works should receive reduced credit.

Other than the two general objections discussed *supra*, no members have raised substantive objections to these specific proposed changes. Therefore, because the Government has not objected, because the proposed changes do not contravene the antitrust purposes of the Consent Decree, and because the proposed changes are the product of sound business judgment by ASCAP's Board, they are approved.

### 5. Qualifying Works

ASCAP proposes several changes in Weighting Rules (B)(2), (3), (4), and (6) as they relate to qualification. Qualification is a term used to describe ASCAP's forty-year principle "that non-feature uses of works with a substantial prior history of feature performances 'qualify' for more than the minimum credit otherwise given unknown or little-known compositions for the same uses."

Bergman I Aff. at 12. ASCAP contends that over time, as its surveys have been expanded, the required feature credit thresholds for becoming a qualifying work have proven too easy to reach, resulting in too many works receiving qualifying status, a result not reflective of the value of some of these works to the ASCAP repertory.

Therefore, ASCAP proposes to change the requirements for qualification in Weighting Rule (B)(4) as detailed in Appendix A.[13] Other than the two general objections discussed *supra*, no member has objected on the ground that the changes are inconsistent with the antitrust policies underlying the Consent Decree, nor has the Government objected to the proposed changes. For these reasons and because the changes are the product of sound business judgment by ASCAP's Board, the proposed changes to ¶ (B)(4), and the related changes to ¶ (B)(6), are approved.

Moreover, for the same reasons, the other changes relating to qualification and credit therefor that ASCAP proposes to Weighting Rules (B)(2) and (3) as detailed in Appendix A are approved.

### 6. Time of Day Factors

ASCAP proposes a change in Weighting Rule (H) so as to be permitted to make distinctions in credits for performances on radio programs and local, public, and cable television programs based on time-of-day factors, just as ASCAP now does for network television programs. ASCAP represents that it intends to reduce credit for overnight performances because of the lesser relative value of these performances.

The proposed change is approved because neither the Government nor any members object, the change does not contravene the antitrust policies underlying the Consent Decree, and the change is the product of sound business judgment.

---

**13.** In its original proposed changes, ASCAP suggested that the thresholds for qualifying status be included only as examples in ¶ (B)(4), thereby enabling ASCAP to effect future changes without this Court's approval. After the hearing, however, at which we expressed our concern about taking actual numbers out of the Rules and putting them into the Formula instead, ASCAP submitted revised proposed changes wherein it specified the qualification thresholds in (B)(4), rather than giving them as examples. *See* Appendix A.

## CONCLUSION

For the foregoing reasons, ASCAP's motion to amend the Consent Decree is granted in part and denied in part. Appendix A attached hereto contains Attachments A and C to the Consent Decree with ASCAP's proposed changes. Appendix B attached hereto contains the same documents with the amendments as approved by this Order.

### SO ORDERED

## APPENDIX A

## ATTACHMENT A

(As amended by orders of the Court dated November 15, 1960, September 4, 1963, September 15, 1964, September 12, 1966, July 30, 1976, and June 10, 1989)

### PART I

### Plan I

The following rules shall govern any distribution under Plan I referred to in subsection (A) of Section III of the Order:

(a) At least 20% 15% of the funds distributed under such a plan shall be distributed on the basis of the individual writer member's current performance credits during the applicable preceding four fiscal survey quarter years.

(b) At least 30% of the funds distributed under such a plan shall be distributed on the basis of the individual writer member's average performance credits during the latest available preceding five fiscal survey years. ASCAP may, however, limit the rise in such payments for one year by not more than one-half of any increase for any writer member; ASCAP may limit any fall in such payments by assigning one-third of the fall in the first year, another third in the second year, and the remaining third in the third year.

(c) Not more than 30% of the funds distributed under any such plan may be distributed on the basis of the individual writer member's average performance credits attributable to performances of his "recognized works" during the latest available preceding five fiscal survey years. A "recognized work" is a composition which has received performance credits in the ASCAP survey at least four quarters prior to the quarter in which the performance occurs. Works performed at any time after receiving feature performance credits equal in number to the average number of feature performance credits received in each of the five latest available fiscal survey years by the fifty ASCAP works appearing for the first time in the survey and having the highest number of feature performance credits in each such year, shall receive credit as recognized works. Works performed at any time after receiving feature performance credits in excess of one-half of such average and up to such average shall receive one-half of a recognized works performance credit for each performance credit in excess of one-half of such average and up to such average. ASCAP may limit the rise in such payments for one year by not more than one-half of any increase for any writer member; ASCAP may limit any fall in such payments by assigning one-third of the fall in the first year, another third in the second year, and the remaining third in the third year.

(d) Not more than 20% 25% of the funds distributed under such a plan may be distributed on a basis of the average of the individual writer member's annual ratings for not more than 10 years multiplied by his length of membership in ASCAP. No writer member may be given credit for more than 42 years of membership. Annual ratings may be computed separately for each fiscal survey year on the basis of the writer member's current performance credits for such year, and, with respect to writer members having 39,000 or more current performance credits in a fiscal survey year, rules may be adopted for computing annual ratings which will have the effect of such writer members' receiving lower annual ratings than they would if their annual ratings were computed on the same basis as the annual ratings of all other writer members receiving distributions under this paragraph (d), provided that all writer members having a like number of current performance credits for any such year shall receive the same annual ratings for that year.

(e) In computing the five-year averages called for in paragraphs (b) and (c) and the ten-year average annual ratings called for in paragraph (d) hereof, performance credits

recorded during years when the member received payment on a current performance basis shall not be considered. In computing a member's length of membership in the Society for purposes of any payments made under the provisions of paragraph (d) hereof, the number of years during which the member received payment on a current performance basis shall be subtracted from the number of years he has actually been a member of the Society. Notwithstanding the foregoing, in the case of a new writer member who receives distributions on a current performance basis and who, thereafter, cancels such election effective for distributions based on performances not later than the beginning of the fourth full fiscal survey year following the most recent fiscal survey quarter year considered in computing distributions to such new writer member, (i) performance credits recorded during the intervening years when the new member received payment on a current performance basis may be considered in computing the averages called for in paragraphs (b), (c) and (d) hereof, and (ii) the intervening years during which the new member received payment on a current performance basis may be included in computing the new member's length of membership for purposes of any payments made under the provisions of paragraph (d) hereof.

(f) Paragraphs (b), (c) and (d) above, need not apply to writer members having either 39,000 or more average performance credits or 39,000 or more average performance credits attributable to performances of recognized works, so long as such writer members shall have the option to receive distributions on a current performance basis under Plan II. This exemption shall apply if the rules substituted therefor will have the effect of such writer members receiving as a group substantially less money per performance credit than they would if paid on the basis of current performance credits.

## PART II

### Plan II: Current Performance Option

The following rule shall govern the current performance option referred to in subsection (A) of Section III of the Order.

An electing writer member shall receive a distribution each quarter which bears the same relationship to the share of distributable revenues to all electing writers as the writer member's current performance credits in the applicable fiscal survey quarter year bear to the total performance credits of all electing writer members for such period. ~~ASCAP may phase in this distribution method over a period of 10 quarterly distributions beginning with the first quarterly distribution in 1989 in which it is feasible to do so.~~

## PART III

The Writers' Distribution Formula submitted herewith shall be deemed initially to comply with the provisions of Section III of the Order and this Attachment A, and may not be amended without 30 days prior written notice to the plaintiff.

## ATTACHMENT C

(As amended by orders of the Court dated April 6, 1962, September 4, 1963 September 15, 1965, September 12, 1966, February 4, 1969, October 10, 1969, June 24, 1974, November 25, 1981, and May 4, 1984)

### Weighting Rules

In awarding credit for a performance appearing in the Society's survey, no distinction shall be made on the basis of the identity or use of the work performed, except as provided in these Weighting Rules.

(A) As used in these Weighting Rules:

(1) *"Theme"* shall mean a musical work used as an identifying signature ~~of a radio or television personality or of all or part~~ of a radio or television program or series of programs. ~~A musical work (other than a jingle) used in conjunction with an advertising, promotional or public service announcement shall receive the same credit as a theme.~~

(2) *"Background Music"* shall mean mood, atmosphere or thematic music performed as background to some non-musical subject matter being presented on a radio or

television program. A vocal or a visual instrumental rendition which is a principal focus of audience attention shall not be regarded as background music regardless of the context in which performed.

*(3) "Jingle"* shall mean an advertising, promotional or public service announcement containing musical material (with or without lyrics), where (a) the musical material was originally written for advertising, promotional or public service announcement purposes or (b) the performance is of a musical work, originally written for other purposes, with the lyrics changed for advertising, promotional or public service announcement purposes with the permission of the ASCAP member or members in interest, or (c) the performance is of a musical work, originally written for other purposes, which does not have at least ~~five~~ one hundred and fifty feature performance credits ~~playings~~ recorded in the Society's radio and television surveys during the five preceding fiscal survey years.

*(4) "Cue Music"* shall mean music used on a radio or television program to introduce, but not to identify, a personality or event thereon. The term "cue music" includes, but is not limited to, introductions, "play-ons" and "play-offs".

*(5) "Bridge Music"* shall mean music used on a radio or television program as a connective link between segments or portions thereof.

*(6) "Use"* shall mean a performance of a composition reported by the ASCAP survey.

*(7)(a) "Feature Performance"* shall mean any performance which is a principal focus of audience attention and which constitutes a musical subject matter on a radio or television program and is not a performance as a theme, jingle, background, cue or bridge music, or in conjunction with an advertising, promotional or public service announcement or a logo. A visual instrumental or vocal performance shall be presumed to be a feature performance unless such performance is as a theme or a jingle or in conjunction with an advertising, promotional or public service announcement or logo or is not a principal focus of audience attention.

*(b) "Visual Instrumental Performance"* shall mean a performance by a musician or musicians who are seen by the television viewing audience.

*(c) "Vocal Performance"* shall mean the performance of the lyrics of a composition or the on-camera humming or whistling of the music of a composition.

*(d) "Musical Subject Matter"* shall mean the presentation in a program of an activity (i) which normally involves the performance of music—such as singing, playing a musical instrument, or dancing (including skating in a manner akin to dancing or ballet), and (ii) in which such music is the music written for or used in the original presentation as the work being sung, played, or danced to.

*(8) "Performance Credit"* shall mean the unit of measure of the results of the survey, being derived by multiplying uses or fractional uses by the applicable sampling and economic multipliers.

(B) Each feature performance is to be awarded one use credit, except as provided herein and in subsections (D), (E) and (H) hereof. Fractional use credit may be awarded to compositions performed as a theme, ~~or~~ jingle or as background, cue or bridge music, or (for compositions other than a jingle) in conjunction with advertising, promotional and public service announcements and logos, or performances of copyrighted arrangements of works in the public domain.

(1) ASCAP may promulgate rules limiting the credits awarded to feature performances of works which (i) ~~have not had five feature playings in the ASCAP local radio sample survey in the five most recent fiscal survey years including any processed quarter of the current survey year~~ do not comply with the tests set forth in paragraph (4) below and (ii) are less than 45 seconds in length.

(2) ASCAP may make distinctions in the amount of credit awarded to various works for similar uses when used as themes, ~~or as~~ background, cue or bridge music, or (for compositions other than a jingle) in conjunction with advertising, promotional and public service announcements, provided that such distinctions shall be based solely on the number of radio and television feature perfor-

mance credits received by the work prior to the fiscal survey year for which credit is to be awarded as provided in paragraph (4) below. ASCAP may also make distinctions in the amount of credit awarded for various works used as themes on television programs provided that such distinctions shall be based on (i) the number of weeks the work is used on the program and (ii) as to network television programs, the time of day of such use.

(3) Such distinctions for similar uses as themes or cue or bridge music shall not be of a greater ratio than 5 to 1. In the case of background music, such distinction shall not be of a greater ratio than 5 to 2 between works qualifying under paragraph (4) below and nonqualifying works which have had five feature playings recorded in the ASCAP local radio sample survey during the five preceding fiscal survey years; other Works which qualify under Paragraph (4) below when used as background, cue or bridge music may be awarded fractional use credit on a durational basis or qualifying work credit, whichever is greater. Nonqualifying works when used as background, cue or bridge music may be awarded fractional use credit on a durational basis. Background, cue or bridge music on each program receiving credit on a durational basis shall receive, for each three minutes' duration in the aggregate for that program, 42% of a use credit; multiples or fractions of three minutes shall be computed on a per second basis pro rata to the 42% use credit weight for three minutes; provided, however, that in no event shall such performance receive less than 1% of a use credit. as provided in paragraph (4) below. There shall be no distinction in the amount of credit for use of compositions as jingles.

(4) Such The distinctions referred to in Paragraph (2) above shall be based upon compliance with both of the following tests for maximum credit: (subject to the provisions of paragraph (6) below)

(a) a number of accumulated radio and television feature performance credits (not to exceed 20,000 credits since January 1, 1943 October 1, 1959, for a fully qualifying work), and

(b) a number of radio and television feature performance credits (not to exceed 2,500 5,000) in the five latest available preceding fiscal survey years, toward which there may be a limit of not more than 30% of such number of credits to be counted in any one year; provided, however, that when a work accumulates 150,000 radio and television feature performance credits it shall be deemed to be in compliance with this test.

A work performed as a theme and which complies with the requirements of subparagraph (b) of this paragraph (4) shall receive 75% or 50% of such maximum credit if it has accumulated 75% or 50% respectively, of the number of accumulated feature performance credits required by subparagraph (a) of this paragraph (4). Background music on each program receiving credit on a durational basis shall receive, for each three minutes' duration in the aggregate for that program, 36% of a use credit; fractions of three minutes shall be computed on the basis of 6% for each thirty seconds or major fraction thereof.

(5) Until five years of records of feature performances are available, the number of feature performance credits required pursuant to subparagraph (b) of paragraph (4) above shall be reduced proportionately to the number of years available. For a work whose first surveyed performance occurred within the five latest available preceding fiscal survey years, the requirement of said subparagraph (b) shall be satisfied when the work has met the requirements of subparagraph (a) of paragraph (4) above and shall continue to be satisfied if in each subsequent year of such five years the work receives one-fifth the number of feature performance credits required by said subparagraph (b).

(6) ASCAP shall promulgate rules providing that:

(a) Any work first performed before January 1, 1943 shall satisfy the requirements of subparagraph (a) of paragraph (4) above if the title of the work appears in the publication *Variety Music Cavalcade,* Prentice-Hall 1952, or among the top ten on the "Lucky Strike Hit Parade" or the top ten on the weekly list of the most popular songs published in *Variety or Billboard.*

(b) ~~If any work first performed on or after January 1, 1943 has received the number of performance credits required pursuant to subparagraph (a) of paragraph (4) above in the two consecutive fiscal survey years commencing with the year in which its first performance is recorded in the survey, or if the title of such work appears in the publication Variety Music Cavalcade, Prentice-Hall 1952, or among the top ten on the "Lucky Strike Hit Parade" or the top ten on the weekly list of the most popular songs published in Variety or Billboard, there shall be a rebuttable presumption that such performance credits recorded before October 1, 1955 reflect feature performances; otherwise, the burden shall be on the member to establish that performance credits recorded before October 1, 1955 reflect feature performances.~~

(C) The number of performance credits needed to meet any requirement pursuant to paragraph (4) above is premised on an annual total of approximately 25,000,000 performance credits recorded in the ASCAP survey; performance credits in years when the total number of performance credits recorded in the ASCAP survey was 20% greater or smaller than that number shall be adjusted proportionately.

(D) ASCAP may promulgate rules limiting the credit to be awarded (a) to multiple performances of the same work or aggregate performances of all works on a single program or during a period of programming or on a continuing series of the same program which is presented two or more times per week, or (b) to individual performances of a work in conjunction with an advertising or promotional announcement sponsored by the network or station on which it appears. ASCAP may make distinctions on the basis of the length of the performance or on whether it was a vocal or a visual instrumental performance, or on whether the work is written or published by persons regularly associated with the program on which such performances are rendered.

(E) Multiple use credits may be awarded for performances of works which require four minutes or more for a single, complete rendition thereof, and such credit may be limited to certain works, e.g., those which in their original form were composed for a choral, symphonic or similar concert performance (including chamber music). ASCAP may also distribute to its members, for performances of their works in concert and symphony halls, amounts in excess of the license fees it receives from such licensees (e.g., five times said license fees).

(F) ASCAP may promulgate rules limiting the crediting of performances of works of a member on programs for which the music information is prepared by such member or by a person associated with such member and which, on the basis of available data, appears to be inaccurate and where video tapes or other audio-visual recordings are not available.

(G) ASCAP may promulgate rules providing for additional credit for works performed as themes on a television musical or variety program where the performance is rendered on-camera either vocally, instrumentally or by dancer(s) and constitutes a principal focus of audience attention.

(H) ASCAP may make reasonable distinctions in the amount of credit awarded for performances of works on <u>radio and</u> television ~~network~~ programs on the basis of the following:

(1) the time of day;

(2) day of week;

(3) holidays as opposed to other days.

(I) The Weighting Formula submitted herewith shall be deemed initially to comply with all of the provisions of the Order and this Attachment C, and may not be amended without 30 days prior written notice to the plaintiff.

## APPENDIX B

## ATTACHMENT A

(As amended by orders of the Court dated November 15, 1960, September 4, 1963, September 15, 1964, September 12, 1966, July 30, 1976, and June 10, 1989)

## PART I

### Plan I

The following rules shall govern any distribution under Plan I referred to in subsection (A) of Section III of the Order:

(a) At least ~~20%~~ 15% of the funds distributed under such a plan shall be distributed on the basis of the individual writer member's current performance credits during the applicable preceding four fiscal survey quarter years.

(b) At least 30% of the funds distributed under such a plan shall be distributed on the basis of the individual writer member's average performance credits during the latest available preceding five fiscal survey years. ASCAP may, however, limit the rise in such payments for one year by not more than one-half of any increase for any writer member; ASCAP may limit any fall in such payments by assigning one-third of the fall in the first year, another third in the second year, and the remaining third in the third year.

(c) Not more than 30% of the funds distributed under any such plan may be distributed on the basis of the individual writer member's average performance credits attributable to performances of his "recognized works" during the latest available preceding five fiscal survey years. A "recognized work" is a composition which has received performance credits in the ASCAP survey at least four quarters prior to the quarter in which the performance occurs. Works performed at any time after receiving feature performance credits equal in number to the average number of feature performance credits received in each of the five latest available fiscal survey years by the fifty ASCAP works appearing for the first time in the survey and having the highest number of feature performance credits in each such year, shall receive credit as recognized works. Works performed at any time after receiving feature performance credits in excess of one-half of such average and up to such average shall receive one-half of a recognized works performance credit for each performance credit in excess of one-half of such average and up to such average. AS-

CAP may limit the rise in such payments for one year by not more than one-half of any increase for any writer member; ASCAP may limit any fall in such payments by assigning one-third of the fall in the first year, another third in the second year, and the remaining third in the third year.

(d) Not more than ~~20%~~ 25% of the funds distributed under such a plan may be distributed on a basis of the average of the individual writer member's annual ratings for not more than 10 years multiplied by his length of membership in ASCAP. No writer member may be given credit for more than 42 years of membership. Annual ratings may be computed separately for each fiscal survey year on the basis of the writer member's current performance credits for such year, and, with respect to writer members having 39,000 or more current performance credits in a fiscal survey year, rules may be adopted for computing annual ratings which will have the effect of such writer members' receiving lower annual ratings than they would if their annual ratings were computed on the same basis as the annual ratings of all other writer members receiving distributions under this paragraph (d), provided that all writer members having a like number of current performance credits for any such year shall receive the same annual ratings for that year.

(e) In computing the five-year averages called for in paragraphs (b) and (c) and the ten-year average annual ratings called for in paragraph (d) hereof, performance credits recorded during years when the member received payment on a current performance basis shall not be considered. In computing a member's length of membership in the Society for purposes of any payments made under the provisions of paragraph (d) hereof, the number of years during which the member received payment on a current performance basis shall be subtracted from the number of years he has actually been a member of the Society. Notwithstanding the foregoing, in the case of a new writer member who receives distributions on a current performance basis and who, thereafter, cancels such election effective for distributions based on performances not later than the beginning of the fourth full fiscal survey year

following the most recent fiscal survey quarter year considered in computing distributions to such new writer member, (i) performance credits recorded during the intervening years when the new member received payment on a current performance basis may be considered in computing the averages called for in paragraphs (b), (c) and (d) hereof, and (ii) the intervening years during which the new member received payment on a current performance basis may be included in computing the new member's length of membership for purposes of any payments made under the provisions of paragraph (d) hereof.

(f) Paragraphs (b), (c) and (d) above, need not apply to writer members having either 39,000 or more average performance credits or 39,000 or more average performance credits attributable to performances of recognized works, so long as such writer members shall have the option to receive distributions on a current performance basis under Plan II. This exemption shall apply if the rules substituted therefor will have the effect of such writer members receiving as a group substantially less money per performance credit than they would if paid on the basis of current performance credits.

## PART II

### Plan II: Current Performance Option

The following rule shall govern the current performance option referred to in subsection (A) of Section III of the Order.

An electing writer member shall receive a distribution each quarter which bears the same relationship to the share of distributable revenues to all electing writers as the writer member's current performance credits in the applicable fiscal survey quarter. year bear to the total performance credits of all electing writer members for such period. ASCAP may phase in this distribution method over a period of 10 quarterly distributions beginning with the first quarterly distribution in 1989 in which it is feasible to do so.

## PART III

The Writers' Distribution Formula submitted herewith shall be deemed initially to comply with the provisions of Section III of the Order and this Attachment A, and may not be amended without 30 days prior written notice to the plaintiff.

## ATTACHMENT C

(As amended by orders of the Court dated April 6, 1962, September 4, 1963 September 15, 1965, September 12, 1966, February 4, 1969, October 10, 1969, June 24, 1974, November 25, 1981, and May 4, 1984)

### Weighting Rules

In awarding credit for a performance appearing in the Society's survey, no distinction shall be made on the basis of the identity or use of the work performed, except as provided in these Weighting Rules.

(A) As used in these Weighting Rules:

(1) "Theme" shall mean a musical work used as an identifying signature of a radio or television personality or of all or part of a radio or television program or series of programs. A musical work (other than a jingle) used in conjunction with an advertising, promotional or public service announcement shall receive the credit proposed by the Society as explained in its Application for Amendment to the Consent Decree and Notice to Members in April 1994.

(2) "Background Music" shall mean mood, atmosphere or thematic music performed as background to some non-musical subject matter being presented on a radio or television program. A vocal or a visual instrumental rendition which is a principal focus of audience attention shall not be regarded as background music regardless of the context in which performed.

(3) "Jingle" shall mean an advertising, promotional or public service announcement containing musical material (with or without lyrics), where (a) the musical material was originally written for advertising, promotional or public service announcement purposes or (b) the performance is of a musical work, originally written for other purposes, with

the lyrics changed for advertising, promotional or public service announcement purposes with the permission of the ASCAP member or members in interest, or (c) the performance is of a musical work, originally written for other purposes, which does not have at least ~~five~~ one hundred fifty feature performance credits ~~playings~~ recorded in the Society's radio and television surveys during the five preceding fiscal survey years.

(4) "Cue Music" shall mean music used on a radio or television program to introduce, but not to identify, a personality or event thereon. The term "cue music" includes, but is not limited to, introductions, "play-ons" and "play-offs".

(5) "Bridge Music" shall mean music used on a radio or television program as a connective link between segments or portions thereof.

(6) "Use" shall mean a performance of a composition reported by the ASCAP survey.

(7) (a) "Feature Performance" shall mean any performance which is a principal focus of audience attention and which constitutes a musical subject matter on a radio or television program and is not a performance as a theme, jingle, background, cue or bridge music, or in conjunction with an advertising, promotional or public service announcement or a logo. A visual instrumental or vocal performance shall be presumed to be a feature performance unless such performance is as a theme or a jingle or in conjunction with an advertising, promotional or public service announcement or logo or is not a principal focus of audience attention.

(b) "Visual Instrumental Performance" shall mean a performance by a musician or musicians who are seen by the television viewing audience.

(c) "Vocal Performance" shall mean the performance of the lyrics of a composition or the on-camera humming or whistling of the music of a composition.

(d) "Musical Subject Matter" shall mean the presentation in a program of an activity (i) which normally involves the performance of music—such as singing, playing a musical instrument, or dancing (including skating in a manner akin to dancing or ballet), and (ii) in which such music is the music written for or used in the original presentation as the work being sung, played, or danced to.

(8) "Performance Credit" shall mean the unit of measure of the results of the survey, being derived by multiplying uses or fractional uses by the applicable sampling and economic multipliers.

(B) Each feature performance is to be awarded one use credit, except as provided herein and in subsections (D), (E) and (H) hereof. Fractional use credit may be awarded to compositions performed as a theme, ~~or~~ jingle or as background, cue or bridge music, or (for compositions other than a jingle) in conjunction with advertising, promotional and public service announcements and logos in accordance with Paragraph (A)(1) above, or performances of copyrighted arrangements of works in the public domain.

(1) ASCAP may promulgate rules limiting the credits awarded to feature performances of works which (i) ~~have not had five feature playings in the ASCAP local radio sample survey in the five most recent fiscal survey years including any processed quarter of the current survey year~~ do not comply with the tests set forth in paragraph (4) below and (ii) are less than 45 seconds in length.

(2) ASCAP may make distinctions in the amount of credit awarded to various works for similar uses when used as themes, ~~or as~~ background, cue or bridge music, or (for compositions other than a jingle) in conjunction with advertising, promotional and public service announcements in accordance with Paragraph (A)(1) above, provided that such distinctions shall be based solely on the number of radio and television feature performance credits received by the work prior to the fiscal survey year for which credit is to be awarded as provided in paragraph (4) below. ASCAP may also make distinctions in the amount of credit awarded for various works used as themes on television programs provided that such distinctions shall be based on (i) the number of weeks the work is used on the program and (ii) as to network television programs, the time of day of such use.

(3) ~~Such distinctions for similar uses as themes or cue or bridge music shall not be of~~

~~a greater ratio than 5 to 1. In the case of background music, such distinction shall not be of a greater ratio than 5 to 2 between works qualifying under paragraph (4) below and nonqualifying works which have had five feature playings recorded in the ASCAP local radio sample survey during the five preceding fiscal survey years; other~~ Works which qualify under Paragraph (4) below when used as background, cue or bridge music may be awarded fractional use credit on a durational basis or qualifying work credit, whichever is greater. Nonqualifying works when used as background, cue or bridge music may be awarded fractional use credit on a durational basis. Background, cue or bridge music on each program receiving credit on a durational basis shall receive, for each three minutes' duration in the aggregate for that program, 42% of a use credit; multiples or fractions of three minutes shall be computed on a per second basis pro rata to the 42% use credit weight for three minutes; provided, however, that in no event shall such performance receive less than 1% of a use credit. ~~as provided in paragraph (4) below. There shall be no distinction in the amount of credit for use of compositions as jingles.~~

(4) ~~Such~~ The distinctions referred to in Paragraph (2) above shall be based upon compliance with both of the following tests for maximum credit: ~~(subject to the provisions of paragraph (6) below)~~

(a) a number of accumulated radio and television feature performance credits (not to exceed 20,000 credits since ~~January 1, 1943~~ October 1, 1959, for a fully qualifying work), and

(b) a number of radio and television feature performance credits (not to exceed ~~2,500~~ 5,000) in the five latest available preceding fiscal survey years, toward which there may be a limit of not more than 30% of such number of credits to be counted in any one year; provided, however, that when a work accumulates 150,000 radio and television feature performance credits it shall be deemed to be in compliance with this test.

~~A work performed as a theme and which complies with the requirements of subparagraph (b) of this paragraph (4) shall receive~~

~~75% or 50% of such maximum credit if it has accumulated 75% or 50% respectively, of the number of accumulated feature performance credits required by subparagraph (a) of this paragraph (4). Background music on each program receiving credit on a durational basis shall receive, for each three minutes' duration in the aggregate for that program, 36% of a use credit; fractions of three minutes shall be computed on the basis of 6% for each thirty seconds or major fraction thereof.~~

(5) Until five years of records of feature performances are available, the number of feature performance credits required pursuant to subparagraph (b) of paragraph (4) above shall be reduced proportionately to the number of years available. For a work whose first surveyed performance occurred within the five latest available preceding fiscal survey years, the requirement of said subparagraph (b) shall be satisfied when the work has met the requirements of subparagraph (a) of paragraph (4) above and shall continue to be satisfied if in each subsequent year of such five years the work receives one-fifth the number of feature performance credits required by said subparagraph (b).

~~(6) ASCAP shall promulgate rules providing that:~~

~~(a) Any work first performed before January 1, 1943 shall satisfy the requirements of subparagraph (a) of paragraph (4) above if the title of the work appears in the publication Variety Music Cavalcade, Prentice-Hall 1952, or among the top ten on the "Lucky Strike Hit Parade" or the top ten on the weekly list of the most popular songs published in Variety or Billboard.~~

~~(b) If any work first performed on or after January 1, 1943 has received the number of performance credits required pursuant to subparagraph (a) of paragraph (4) above in the two consecutive fiscal survey years commencing with the year in which its first performance is recorded in the survey, or if the title of such work appears in the publication Variety Music Cavalcade, Prentice-Hall 1952, or among the top ten of the "Lucky Strike Hit Parade" or the top ten on the weekly list of the most popular songs published in Variety or Billboard, there shall be a rebuttable presumption that such perfor-~~

~~mance credits recorded before October 1, 1955 reflect feature performances; otherwise, the burden shall be on the member to establish that performance credits recorded before October 1, 1955 reflect feature performances.~~

(C) The number of performance credits needed to meet any requirement pursuant to paragraph (4) above is premised on an annual total of approximately 25,000,000 performance credits recorded in the ASCAP survey; performance credits in years when the total number of performance credits recorded in the ASCAP survey was 20% greater or smaller than that number shall be adjusted proportionately.

(D) ASCAP may promulgate rules limiting the credit to be awarded (a) to multiple performances of the same work or aggregate performances of all works on a single program or during a period of programming or on a continuing series of the same program which is presented two or more times per week, or (b) to individual performances of a work in conjunction with an advertising or promotional announcement sponsored by the network or station on which it appears. ASCAP may make distinctions on the basis of the length of the performance or on whether it was a vocal or a visual instrumental performance, or on whether the work is written or published by persons regularly associated with the program on which such performances are rendered.

(E) Multiple use credits may be awarded for performances of works which require four minutes or more for a single, complete rendition thereof, and such credit may be limited to certain works, e.g., those which in their original form were composed for a choral, symphonic or similar concert performance (including chamber music). ASCAP may also distribute to its members, for performances of their works in concert and symphony halls, amounts in excess of the license fees it receives from such licensees (e.g., five times said license fees).

(F) ASCAP may promulgate rules limiting the crediting of performances of works of a member on programs for which the music information is prepared by such member or by a person associated with such member and which, on the basis of available data, appears to be inaccurate and where video tapes or other audio-visual recordings are not available.

(G) ASCAP may promulgate rules providing for additional credit for works performed as themes on a television musical or variety program where the performance is rendered on-camera either vocally, instrumentally or by dancer(s) and constitutes a principal focus of audience attention.

(H) ASCAP may make reasonable distinctions in the amount of credit awarded for performances of works on <u>radio and</u> television ~~network~~ programs on the basis of the following:

(1) the time of day;

(2) day of week;

(3) holidays as opposed to other days.

(I) The Weighting Formula submitted herewith shall be deemed initially to comply with all of the provisions of the Order and this Attachment C, and may not be amended without 30 days prior written notice to the plaintiff.